# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| Kenton Young, | |
| Plaintiff, | Civil No. 3:20-cv-00322 (MPS) |
| v. | |
| State of Connecticut et al., | April 30, 2020 |
| Defendants. | |

## RECOMMENDED RULING ON INITIAL REVIEW UNDER 28 U.S.C. § 1915 AND MOTION FOR LEAVE TO PROCEED *IN FORMA PAUPERIS* [ECF NO. 2]

**I.    INTRODUCTION**

This is a suit filed by Kenton Young, an election canvasser for state senator Catherine Osten.  In August 2018 he was campaigning in Norwich.  (*See* Compl., ECF No. 1, ¶ 2.)  A resident called the police, claiming that someone was "entering residents' yards, and illegally entering vehicles."  Norwich police responded to the scene, saw Mr. Young, and questioned him.  (*Id.* ¶¶ 9, 16.)  A similar event occurred two months later in Ledyard.  (*Id.* ¶¶ 20-22.)

Upset at having been stopped and questioned by the police, Mr. Young has sued Senator Osten for (among other things) not doing enough to prevent or respond to the stops.  (*E.g.*, *id.* ¶ 23.)  He has also sued the City of Norwich, its police department, and its police chief Patrick Daley for constitutional violations allegedly arising from the August 2018 stop.  And although his exhibits suggest that it may have been Connecticut State Police Troop E and not the Ledyard Police Department that stopped him two months later, he asserts similar constitutional claims against the Town of Ledyard, its police department, and its police chief John Rich.  He also named the State of Connecticut as a defendant.

Mr. Young moved for leave to proceed *in forma pauperis*, or "IFP." (ECF No. 2.) When a plaintiff seeks permission to begin a lawsuit IFP – that is, without paying the filing fee – the court ordinarily conducts two inquiries. First, it reviews his financial affidavit and determines whether he is truly unable to pay the fee. 28 U.S.C. § 1915(a). Second, to ensure that he is not abusing the privilege of filing a free lawsuit, the court examines his complaint and dismisses any claim that "is frivolous or malicious," "fails to state a claim on which relief may be granted," or "seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. §§ 1915(e)(2)(B). And in all cases – not just IFP cases – the court reviews the complaint to determine whether it has jurisdiction over the subject matter of the case.

United States District Judge Michael P. Shea referred this case to me – United States Magistrate Judge Thomas O. Farrish – to conduct these inquiries. (ECF No. 7.) I have reviewed the complaint and all the exhibits attached to it. I have also reviewed Mr. Young's IFP application and its four pages of exhibits. In the first step of my analysis, **I recommend that the motion for leave to proceed IFP be denied without prejudice** because Mr. Young has not yet demonstrated that he is unable to pay the filing fee. (*See* discussion, Section III *infra*.) His application claims only $145.00 in weekly income, but his exhibits show him earning almost six times that amount. Unless and until he clears up the discrepancy, he is not entitled to proceed IFP.

**I also recommend that Mr. Young's complaint be dismissed without prejudice**, for two principal reasons. First, he has neither paid the filing fee nor shown that he is excused from doing so. Second and more substantively, each of his claims invokes at least one of the above-referenced bases for dismissal. Most fail to state a claim on which relief could be granted; others are asserted against an immune defendant; and others are claims over which this court lacks jurisdiction. (*See* discussion, Section IV *infra*.) I therefore recommend that they be dismissed.

## II. BACKGROUND

Mr. Young began working as an election canvasser for Senator Osten on July 31, 2018.[1] (Compl., ECF No. 1, ¶ 1.)   On August 21, 2018 he was canvassing in Norwich when a "resident notif[ied the] Norwich Police Department claiming plaintiff is entering residents' yards, and illegally entering vehicles." (*Id.* ¶ 9.)  A lone Norwich police officer responded to the call, and "ran plaintiff's license plate to see if he is in [a] database for any criminal activity." (*Id.* ¶ 14.) Although this officer "found no record," he nevertheless "insist[ed] on notifying other officers." (*Id.* ¶ 15.)  Those officers "question[ed] plaintiff regarding why he [was] in [the] area." (*Id.* ¶ 16.) Mr. Young responded that he was campaigning for Senator Osten; an officer countered that he needed approval from the City of Norwich; and the plaintiff replied that he would relay the message to the senator.  (*Id.* ¶¶ 16-18.)  The officers then left.  (*See id.* Ex. 6) (Norwich P.D. call log, reflecting that officers cleared the call within nineteen minutes of receiving it).

Mr. Young felt "intimidate[d] and harass[ed]" by this interaction with the police, and he faults Senator Osten for it in three principal ways.  First, he says that the senator neglected to tell the City of Norwich in advance that her canvassers would be working in the area – and he suggests that, had she given notice, the incident would not have happened.  (*Id.* ¶ 19.)  Second, he claims that after the senator learned about the incident, she should have compensated him for the trauma and given him paid time off to recover from it.  (*Id.* ¶¶ 10, 12, 25 and Exs. 8-10, 12.)  Third, he alleges "ethnic and racial disparities" in police stops by the City of Norwich, and he faults the senator for not warning him about those disparities before sending him out to canvass in the city.

---

[1]     As will be discussed further below, the Court assumes the truth of the complaint's well-pleaded, non-conclusory factual allegations when reviewing an IFP complaint under 28 U.S.C. § 1915(e)(2)(B).  *See Jacobs v. Ramirez*, 400 F.3d 105, 105-06 (2d Cir. 2005) (per curiam).

(*Id.* ¶ 46.)  He also asserts that she "refuse[s] to correct" the disparities even though Norwich is in her senatorial district.  (*Id.* ¶ 48.)

Mr. Young also faults the City of Norwich, its police department and its police chief for the incident and its aftermath.  He alleges that Chief Daley "ignored State of Connecticut Law by instructing [his] officers to enforce unjust circumstances," and was "determine[d] to escalate violence towards plaintiff by illegally surveillance and spying on him, due to the fact he instructed several of his officers to arrive on sense, so they can interrogate him, for no apparent reason, other than to intimidate him."  (*Id.* Prelim. Stmt. and ¶ 39.)  He also alleges that the chief "is ultimately responsible for the training of every police officer" (*id.* ¶ F), and "for any action his employees perform at the local level of government" – including, presumably, the officers who responded to the resident's call.  (*Id.* ¶ G.)  Mr. Young also contends that Chief Daley is aware of racial disparities in traffic stops, yet "refuse[s] to correct it."  (*Id.* ¶ 47.)  And he also says that the chief violated Section 54-1m of the Connecticut General Statutes by failing to provide him with a required certificate, and by failing to report the traffic stop to the appropriate "governmental agency."[2]  (*Id.* ¶¶ 54, 56.)

---

[2]    Section 54-1m is part of the Alvin W. Penn Racial Profiling Prohibition Act, Public Act 99-198.  The Act attacks "the stopping, detention or search of any person when such action is solely motivated by considerations of race, color, ethnicity, age, gender or sexual orientation." Conn. Gen. Stat. § 54-1m(a).

In its current form, the statute effectively requires police departments to notify certain stopped persons of their right to lodge a complaint if they feel that the stop was improperly motivated.  Conn. Gen. Stat. § 54-1m(b)(1).  The statute further obliges police departments to "provide to the Office of Policy and Management a summary report of" the information they collect on traffic stops.  Conn. Gen. Stat. § 54-1m(h).  I interpret paragraphs 54 and 56 of the complaint as alleging that Chief Daley failed to provide Mr. Young with the notice required by Section 54-1m(b)(1) and failed to include the August 21, 2018 stop in the summary report required by Section 54-1m(h).

Mr. Young experienced a similar incident in Ledyard on October 23, 2018. While canvassing that day, an "officer approached" him "due to the fact [that an] off duty Trooper report[ed] plaintiff is illegally going door to door, and should not be in [the] area." (*Id.* ¶ 20.) Mr. Young does not identify the officer, nor state which police department the officer was from, but he attached a Ledyard Police Department call log that provides additional information. (*Id.* Ex. 11.) According to the log, an "off duty Trooper" called the department and reported a suspicious vehicle in the area of Seabury Avenue. (*Id.*) The caller added that "the driver is going door to door, and should not be in the area." (*Id.*) The Ledyard dispatcher alerted a town patrol car, but before the patrol officer arrived, State Police Troop E "made contact" with Mr. Young and reported that "he is doing something with the senator and [Ledyard Police] can disregard." (*Id.*) Thus, the officer who stopped Mr. Young evidently was a trooper from Troop E, not a Ledyard officer.

Mr. Young nevertheless faults Senator Osten, the Town of Ledyard, its police department, and its police chief John Rich for the October incident. He alleges that Senator Osten is responsible because she failed to notify the town that he would be canvassing in the area. (*Id.* ¶ 23.) He asserts that Chief Rich is ultimately responsible for "any action his employees perform," and he charges the chief with "instructing [his] officers to enforce unjust circumstances" and "instruct[ing] several of his officers to arrive on the scene." (*Id.* ¶ 40.) He also alleges that Chief Rich violated the Penn Act by refusing to provide him with a "certificate" – presumably, the notice required by Section 54-1m(b) – and by not including the stop in the summary report required by Section 54-1m(h). (*Id.* ¶¶ 53, 55.)

Mr. Young makes several other claims in his complaint as well. For example, he alleges that Senator Osten was "aware plaintiff suffer[ed] dog attacks, due to him working in [the] community" (*id.* ¶ 52), which I interpret as an additional claim that the senator failed to provide

him with a safe workplace. He also named the State of Connecticut as a defendant, although his complaint contains no factual allegations of misconduct by the state.

Mr. Young moved for leave to proceed IFP. (ECF No. 2.) As previously discussed, when a plaintiff seeks IFP status, the court conducts a two-step inquiry. In Section III of this recommended ruling, I will conduct the first step of the analysis by examining whether Mr. Young is entitled to pursue his suit without paying the filing fee. In Section IV, I will undertake the second step by considering whether Mr. Young's claims should be dismissed because they are "frivolous or malicious," "fail[] to state a claim on which relief may be granted," or "seek[] monetary relief against a defendant who is immune from such relief." 28 U.S.C. §§ 1915(e)(2)(B). I will also consider whether the court has jurisdiction over his claims.

## III.   THE FIRST INQUIRY:  IFP STATUS

When a plaintiff files a complaint in federal court, ordinarily he must pay filing and administrative fees totaling $400. *See* 28 U.S.C. § 1914. District courts may nevertheless authorize commencement of an action "without prepayment of fees . . . by a person who submits an affidavit that includes a statement . . . that the person is unable to pay such fees." 28 U.S.C. § 1915(a)(1); *see also Coleman v. Tollefson*, 575 U.S. 532, 135 S. Ct. 1759, 1761 (2015) (plaintiffs who qualify for IFP status "may commence a civil action without prepaying fees").

To proceed IFP, plaintiffs do not have to show that they are destitute, but they do need to show that paying the required fees would interfere with "the necessities of life." *Potnick v. E. State Hosp.*, 701 F.2d 243, 244 (2d Cir. 1983) (per curiam). "Section 1915(a) does not require a litigant to demonstrate absolute destitution." *Id.* It does, however, require a demonstration that "paying such fees would constitute a serious hardship on the plaintiff." *Fiebelkorn v. U.S.*, 77 Fed. Cl. 59, 62 (2007). An IFP application is therefore "sufficient" when it "states that one cannot because of

6

his poverty pay or give security for the costs and still be able to provide himself and his dependents with the necessities of life." *Adkins v. E.I. DuPont de Nemours & Co*., 335 U.S. 331, 339 (1948) (internal quotation marks omitted).

Applying the "necessities of life" standard, courts generally deny IFP status when the plaintiff's income meaningfully exceeds his expenses.  In *Fridman v. City of New York*, for example, the court denied a motion for leave to proceed IFP because the plaintiff's "household income exceed[ed] expenses," and accordingly he was "not faced with the stark decision between a potentially meritorious claim and forgoing the necessities of life."  195 F. Supp. 2d 534, 538 (S.D.N.Y. 2002).  Another court considered whether the plaintiff's "access to this court" was being "blocked by his financial condition," and denied IFP status when his affidavit revealed enough resources to pay the filing fee.  *Sears, Roebuck & Co. v. Charles W. Sears Real Estate, Inc.*, 686 F. Supp. 385, 388-89 (N.D.N.Y. 1988).  And a court in this district denied IFP status when the plaintiff's disclosed annual income exceeded his annual expenses by more than $10,000.  *Rahimi v. Sec'y of the Navy*, No. 3:19-cv-01852 (JAM), 2019 WL 6529458, at *2 (D. Conn. Dec. 4, 2019) (denying *in forma pauperis* status past the preliminary injunction stage).  While the plaintiff was not rich by any material measure, and while paying the fee sometimes "involves no small measure of financial sacrifice" for many litigants, he had "not shown that he would face the poverty found in cases that have warranted a grant of IFP status." *Id.*

In this case, Mr. Young has not demonstrated that paying the filing fee would interfere with his ability to supply himself with "the necessities of life."  While his application form claims only $145.00 in weekly income (ECF No. 2, at 1), he filed four pay stubs showing that he took home $595.66 for the week of January 20th; $741.59 for the week of January 27th; $897.20 for the week of February 3rd; and $1,030.28 for the week of February 10th.  (ECF No. 2-1.)  His take-home

income for these four pay periods averages out to $816.18 per week, or over $40,080 per year, assuming fifty paid weeks a year. Moreover, Mr. Young reported only $73.00 in monthly expenses. While he no doubt failed to include many expense items, his application and exhibits nevertheless paint a picture of a plaintiff whose monthly income exceeds expenses by more than a *de minimis* amount.

Under these circumstances, I am constrained to recommend denial of the IFP application. I further recommend, however, that the denial be without prejudice. If my recommendation is accepted, that would mean that Mr. Young could file a new IFP motion, clearing up his income and expense picture and explaining the discrepancy in his original application.

## IV. THE SECOND INQUIRY: REVIEW OF THE COMPLAINT UNDER 28 U.S.C. § 1915(e)(2)(B)

When a plaintiff neither pays the filing fee nor demonstrates that he is unable to do so, some courts dismiss his case for these reasons alone – in other words, without proceeding to the second step of the Section 1915 analysis. *E.g.*, *Richardson v. Napoli*, No. 9:09-CV-1440 (TJM) (DEP), 2010 WL 1235383 (N.D.N.Y. Mar. 30, 2010). Other courts have held that it is more efficient to conduct both inquiries at once. *See, e.g.*, *Bank of N.Y. v. Consiglio*, No. 3:17-cv-01408 (CSH) (SALM), 2017 WL 9480197 at *3 (D. Conn. Oct. 2, 2017) (conducting Section 1915(e)(2)(B) analysis even though plaintiff's IFP motion failed under Section 1915(a)). Although Mr. Young has not passed the first inquiry, in the interest of efficiency I will conduct the second inquiry now.

As noted, this second inquiry involves four tasks. First, the court examines the complaint and considers whether "the action . . . is frivolous or malicious." 28 U.S.C. § 1915(e)(2)(B)(i). Second, the court considers whether the complaint "fails to state a claim on which relief may be granted." 28 U.S.C. § 1915(e)(2)(B)(ii). Third, it reviews the complaint to determine whether the

plaintiff "seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B)(iii). And in all cases – not just those cases in which the plaintiff seeks to proceed IFP – the court considers whether it has jurisdiction over the subject matter of the case. *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012) ("When a requirement goes to subject-matter jurisdiction, courts are obligated to consider *sua sponte* issues that the parties have disclaimed or have not presented."). For each of these four tasks, I will first explain the applicable legal principles, and then explain how they apply to Mr. Young's complaint.

## A.    Applicable Legal Principles

### 1.    "Frivolous or malicious"

A complaint is "frivolous" when it is entirely without a factual or legal basis. As the Court of Appeals has explained, an "action is 'frivolous' for § 1915(e) purposes if it has no arguable basis in law or fact, as is the case if it is based on an 'indisputably meritless legal theory.'" *Montero v. Travis*, 171 F.3d 757, 760 (2d Cir. 1999) (per curiam) (quoting *Neitzke v. Williams*, 490 U.S. 319 (1989)). The "term 'frivolous,' when applied to a complaint, embraces not only the inarguable legal conclusion, but also the fanciful factual allegation." *Neitzke*, 490 U.S. at 325. A claim is also "frivolous" when, among other things, a dispositive defense clearly exists on the face of the complaint. *See Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995).

Courts are less unanimous about the scope of the term "malicious," but all seem to agree that a complaint should be dismissed when its purpose is not to obtain relief but rather to vex the defendant. While "[a] separate standard for maliciousness is not as well established," *Abraham v. Danberg,* 699 F. Supp. 2d 686, 688 (D. Del. 2010) (internal quotation marks omitted), it seems to be common ground that a complaint should be dismissed as "malicious" under Section 1915(e)(2)(B)(i) when it was filed with an "intention or desire to harm another." *E.g., Knapp v.*

*Hogan*, 738 F.3d 1106, 1109 (9th Cir. 2013).  As the Second Circuit explained when interpreting

the same word in the context of 28 U.S.C. § 1915A, a complaint is "malicious" when its purpose

is "not to rectify any cognizable harm, but only to harass and disparage" the defendant.  *Tapia-*

*Ortiz v. Winter*, 185 F.3d 8, 11 (2d Cir. 1999) (per curiam).

> **2.    "Fails to state a claim on which relief may be granted"**

A complaint fails to state a claim when it lacks "sufficient factual matter, accepted as true,

to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"Facial plausibility," in turn, requires the pleading of "factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  When an IFP

complaint lacks this "facial plausibility," it must be dismissed.  *See* 28 U.S.C. § 1915(e)(2)(B)(ii);

*Gordon v. Suffolk Cty.*, 792 F. App'x 128, 129 (2d Cir. 2020) (summary order).

These and other pleading rules are applied liberally in favor of *pro se* plaintiffs.  "Since

most *pro se* plaintiffs lack familiarity with the formalities of pleading requirements," courts must

"construe *pro se* complaints liberally, applying a more flexible standard to evaluate their

sufficiency than we would when reviewing a complaint submitted by counsel." *Lerman v. Bd. of*

*Elections*, 232 F.3d 135, 139-40 (2d Cir. 2000).  In other words, courts interpret *pro se* complaints

"to raise the strongest arguments they suggest." *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006)

(internal quotation marks omitted).  Because *pro se* litigants "cannot be expected to know all of

the legal theories on which they might ultimately recover," a reviewing court's "imagination

should be limited only by [the] factual allegations" when determining what legal claims the

complaint suggests.  *Phillips v. Girdich*, 408 F.3d 124, 130 (2d Cir. 2005).

This liberality has limits, however – and one limit is that the court may not fill the gaps in

a *pro se* plaintiff's complaint by imagining facts that he did not plead.  Although courts "are

obligated to draw the most favorable inferences that [a *pro se* plaintiff's] complaint supports," they "cannot invent factual allegations that he has not pled." *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010). In *Jiles v. Rochester Genesee Regional Transportation Authority*, for example, the plaintiff sought to avoid dismissal by positing facts that were not alleged in her complaint. 217 F. Supp. 3d 688, 692-93 (W.D.N.Y. 2016). The court dismissed her case despite her "status as a *pro se* litigant and the requirement that [her] papers be read liberally," because this liberality did not permit it to "assume or invent facts in favor of Plaintiff's position." *Id.* at 692; *accord Ambrose v. Dell*, No. 12-cv-6721 (JPO), 2016 WL 894456, at *3 (S.D.N.Y. Mar. 8, 2016) ("the Court cannot invent facts Ambrose has not alleged") (internal quotation marks omitted). As Judge Shea has written, "[e]ven a *pro se* plaintiff . . . must meet the standard of facial plausibility." *McQuay v. Pelkey*, No. 3:16-cv-436 (MPS), 2017 WL 2174403, at *2 (D. Conn. May 17, 2017).

When considering whether the complaint "state[s] a claim on which relief may be granted," courts assume the truth of the plaintiff's well-pleaded and non-conclusory factual allegations – but "well-pleaded and non-conclusory" is an important qualification. *See Iqbal*, 556 U.S. at 679. The *Iqbal* case explains this point. In *Iqbal* the plaintiff was one of over 180 Muslim men detained by the FBI after the September 11, 2001 terrorist attacks. *Id.* at 667. He sued the Attorney General of the United States, alleging that the Attorney General personally "knew of, condoned, and willfully and maliciously agreed to subject him to harsh conditions of confinement as a matter of policy, solely on account of his religion." *Id.* at 680 (brackets and quotation marks omitted). While this allegation had a seemingly "factual" quality, it was nevertheless "nothing more than a formulaic recitation of the elements of a constitutional discrimination claim." *Id.* at 681 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)) (quotation marks omitted). And such recitations are "conclusory" and "disentitle[d] . . . to the presumption of truth." *Id.*

11

### 3. "Seeks monetary relief against a defendant who is immune from such relief"

An IFP complaint must be dismissed if it "seeks monetary relief against a defendant who is immune from such relief," 28 U.S.C. § 1915(e)(2)(B)(iii), and this principle is especially relevant when the defendant is a state government because states are generally immune from suits for money damages. "[E]ach state is a sovereign entity in our federal system," and "it is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent." *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 54 (1996) (internal quotation marks omitted). This immunity is "not absolute," and does not apply when Congress abrogates it by statute or when the state agrees to be sued. *Close v. N.Y.*, 125 F.3d 31, 36 (2d Cir. 1997). But when a plaintiff sues a state for money damages in federal court, and the state's immunity has neither been abrogated by Congress nor waived by the state itself, the suit is properly dismissed. 28 U.S.C. § 1915(e)(2)(B)(iii); *see also Inkel v. Conn.*, No. 3:17-cv-1400 (MPS), 2019 WL 1230358, at *5 (D. Conn. Mar. 15, 2019); *Lyon v. Jones*, 168 F. Supp. 2d 1, 5-6 (D. Conn. 2001).

### 4. Subject matter jurisdiction

Federal courts are courts of "limited jurisdiction," meaning that they cannot hear just any case. *Kokkonen v. Guardian Life Ins. Co of Am.*, 511 U.S. 375, 377 (1994). Leaving aside some others that are not relevant here, a federal court can typically adjudicate only three types of claims: (1) those that "aris[e] under the Constitution, laws, or treaties of the United States" – so-called "federal question" jurisdiction under 28 U.S.C. § 1331; (2) disputes between citizens of different states, where the amount in controversy exceeds $75,000 – "diversity jurisdiction" under 28 U.S.C. § 1332; and (3) under certain circumstances, other claims that are "so related" to an "original jurisdiction" claim that they "form part of the same case or controversy under Article III of the United States Constitution" – "supplemental jurisdiction" under 28 U.S.C. 1367(a).

When a federal court lacks jurisdiction over the subject matter of a case, dismissal is required. Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."); *Yong Qin Luo v. Mikel*, 625 F.3d 772, 775 (2d Cir. 2010) (per curiam) ("Where jurisdiction is lacking . . . dismissal is mandatory.") (internal quotation marks omitted); *State of Conn. v. Levi Strauss & Co.,* 471 F. Supp. 363, 372 (D. Conn. 1979) (declining to hear case because "[n]either federal question nor diversity jurisdiction is properly invoked"). Moreover, when subject matter jurisdiction is lacking, the complaint must be dismissed even if it was drafted by a *pro se* plaintiff. *See*, *e.g.*, *Rene v. Citibank N.A.,* 32 F. Supp. 2d 539, 541 (E.D.N.Y. 1999); *cf. Makarova v. U.S.,* 201 F.3d 110, 113 (2d Cir. 2000) (*pro se* plaintiff bore the burden of proving subject matter jurisdiction). In other words, while *pro se* complaints are reviewed liberally, that liberality does not stretch so far as to cause a court to hear a case that is outside its jurisdiction. *Cf. Makarova,* 201 F.3d at 113; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir. 1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") (internal quotation marks omitted).

**B.    Application to Mr. Young's Complaint**

In his complaint, Mr. Young references several potential causes of action by name. He claims to be proceeding "under Title VII of the Civil Rights Act," and he alleges that the defendants violated his rights under the First, Fourth, Fifth and Fourteenth Amendments. (Compl., ECF No. 1, Prelim. Stmt.) He asserts that "[a]ll of the defendants violated" the Penn Act, Conn. Gen. Stat. § 54-1m. (*Id.*) And he alleges that "[a]ll of the defendants caused the plaintiff extreme emotional distress." (*Id.*)

As previously noted, *pro se* plaintiffs "cannot be expected to know all of the legal theories on which they might ultimately recover." *Phillips*, 408 F.3d at 130. When reviewing IFP

complaints under Section 1915(e)(2), courts therefore examine the factual allegations and consider what theories of recovery they suggest, without limiting themselves to the theories expressly identified by the plaintiff. *See id.* Applied to this case, this means that my analysis should not stop with the potential causes of action referenced in Mr. Young's complaint. I should also consider whether his non-conclusory factual allegations, if proven, would add up to some meritorious claim that he did not think of.

Stretching my imagination as directed by *Phillips,* I construe Mr. Young's factual allegations as attempting to raise eleven claims: (1) violation of his rights under the Fourth Amendment to the United States Constitution, actionable through 42 U.S.C. § 1983 ("Section 1983"); (2) violation of his right to equal protection of the laws under the Fourteenth Amendment and Section 1983; (3) violation of his rights under the First Amendment and Section 1983; (4) violation of his rights under the Fifth Amendment and Section 1983; (5) conspiracy to interfere with his civil rights under 42 U.S.C. § 1985; (6) employment discrimination under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e-2 *et seq.*; (7) a claim against Senator Osten under the Occupational Safety and Health Act ("OSHA"), for failure to provide him with a safe workplace; (8) a claim against Senator Osten under the Family and Medical Leave Act ("FMLA") for refusing to provide him with paid time off to recover from the August 2018 incident; (9) claims against Senator Osten, Chief Daley and Chief Rich for failure to comply with the notice and reporting provisions of the Penn Act, Conn. Gen. Stat. § 54-1m; (10) common law, state law claims for intentional and negligent infliction of emotional distress; and (11) unspecified claims against the State of Connecticut. I will discuss each claim in turn.

### 1. Fourth Amendment

The Fourth Amendment to the United States Constitution states that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated . . . ."  U.S. Const. amend. IV.  When a police officer, acting "under color of" state law, "subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights" guaranteed by the Fourth Amendment, that citizen may bring an action for damages through Section 1983.  42 U.S.C. § 1983.

The Fourth Amendment does not protect against all "searches and seizures" – only "unreasonable" ones.  "[W]hat the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures."  *Elkins v. U.S.*, 364 U.S. 206, 222 (1960).  "Reasonableness," in turn, is "generally determined by balancing the particular need to search or seize against the privacy interests invaded by such action."  *U.S. v. Bailey*, 743 F.3d 322, 331 (2d Cir. 2014).  Applying this balancing approach, courts have identified three classes of police-citizen interactions: (1) arrests, which are subject to the Fourth Amendment's "probable cause" requirement; (2) brief investigatory stops, called "Terry stops" after the case of *Terry v. Ohio*, 391 U.S. 1 (1968); and (3) encounters that are so lacking in "physical force or show of authority" that they do not constitute a seizure at all – as, for example, when an officer merely walks up to a citizen and asks him a question.  *See Fla. v. Bostick*, 501 U.S. 429, 433-34 (1991); *Brown v. City of Oneonta*, 221 F.3d 331, 340 (2d Cir. 2000).

Terry stops do not require probable cause, but instead may be conducted upon the lower standard of "reasonable suspicion."  "[P]olice can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause."  *U.S. v. Sokolow*, 490 U.S. 1, 7

(1989) (internal quotation marks omitted).  While a Terry stop cannot be based on a mere "hunch," the officer has "reasonable suspicion" to conduct such a stop when he can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion."  *Terry*, 392 U.S. at 21.

Terry stops are distinguished from arrests by the degree of intrusion into the stopped person's affairs.  Terry stops remain Terry stops, and do not develop into arrests for constitutional purposes, when they are "reasonably related in scope to the justification for their initiation."  *U.S. v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975) (quoting *Terry*, 392 U.S. at 29) (quotation marks omitted).  In deciding whether a stop is so limited, courts consider whether "the means of detention are 'more intrusive than necessary.'"  *U.S. v. Tehrani*, 49 F.3d 54, 61 (2d Cir. 1995) (quoting *U.S. v. Perea*, 986 F.2d 633 (2d Cir. 1993)).  Factors to be considered in this "intrusiveness" analysis include "the amount of force used by police, the need for such force, and the extent to which the individual's freedom of movement was restrained."  *Id.*  They also include "the number of agents involved, whether the target of the stop was suspected of being armed, and the physical treatment of the subject, including whether handcuffs were used."  *Id.*  "A critical factor in evaluating the intrusiveness of the stop is the length of the detention."  *U.S. v. Glover*, 957 F.2d 1004, 1011 (2d Cir. 1992); *Pinter v. City of N.Y.*, 976 F. Supp. 2d 539, 565 (S.D.N.Y. 2013).

Where, as here, the chain of events began with a citizen's telephone report of suspicious activity, the reasonableness of a subsequent Terry stop is determined with reference to the content and reliability of the call.  *Navarette v. Cal.*, 572 U.S. 393, 396-97 (2014).  Courts have sustained the validity of Terry stops when the telephone informant expressly or implicitly claimed eyewitness knowledge of suspected criminal activity.  *E.g., id.* at 399 ("That basis of knowledge lends significant support to the tip's reliability.").  Courts have also regarded telephone informants

as reliable when they report their tips through 911; because 911 calls have "some features that allow for identifying and tracing callers," they are generally more reliable because they "provide some safeguards against making false reports with immunity." *Id.* at 400 (citing *Fla. v. J.L.*, 529 U.S. 266 (2000)). Moreover, police may initiate a Terry stop even when there are other, innocent explanations for the activity that the caller is reporting, because the Supreme Court has "consistently recognized that reasonable suspicion 'need not rule out the possibility of innocent conduct.'" *Id.* at 403 (quoting *U.S. v. Arvizu*, 534 U.S. 266 (2002)).

In this case, the August 2018 Norwich stop was – at most – a Terry stop. The complaint contains no non-conclusory allegations from which it could reasonably be inferred that the incident developed into an arrest requiring probable cause. Even in Mr. Young's telling, the Norwich police applied no force; did not treat him as a person suspected of being armed, *e.g.*, by subjecting him to a pat-down; did not engage in any rough treatment; and did not handcuff him. So far as his complaint discloses, they simply asked him why he was in the area – and when he told them that he was canvassing for Senator Osten, they told him to get approval from the City and then left. (Compl., ECF No. 1, ¶¶ 16-18.) While he does complain that the City sent more officers than necessary (*id.* ¶ 15), courts routinely hold that this factor, on its own, is insufficient to convert a Terry stop into an arrest. *See, e.g., U.S. v. Zapata*, 18 F.3d 971, 976 (1st Cir. 1994) ("Mere numbers do not automatically convert a lawful *Terry* stop into something more forbidding"); *U.S. v. Lee*, 317 F.3d 26, 31 (1st Cir. 2003) ("Although there were five officers on the scene, that fact, without more, does not lead inexorably to the conclusion that a de facto arrest occurred."); *U.S. v. Newton*, 369 F.3d 659, 675 (2d Cir. 2004) ("The number of officers on the scene would not, by itself, have led a reasonable person in Newton's shoes to conclude that he was in custody."). And the "critical factor" – the "length of the detention," *Glover*, 957 F.2d at 1011 – counsels in favor of regarding

the incident as no more than a Terry stop.  Mr. Young's exhibits confirm that the entire incident lasted nineteen minutes, including the time it took the officers to drive to the scene.  (*Id.* Ex. 6.)

Because the Norwich officers did not arrest Mr. Young in the constitutional sense, his Fourth Amendment claims fail because his complaint describes "reasonable suspicion" for stopping him.  As Exhibit 6 discloses, an identified caller called the City's police dispatch system – presumably 911 – and reported a "black male, bald, tan pants, grey polo with black collar, walking into peoples [sic] yards and going into vehicles in the area."  (*Id.*) The caller clearly described criminal activity – "going into vehicles" – and the existence of "reasonable suspicion" is not negated by the fact that this description ultimately turned out to be mistaken.  *See Navarette* 572 U.S. at 403 (caller created "reasonable suspicion" sufficient to justify a Terry stop even though there were other, potentially innocent explanations for the behavior she reported).  Moreover, the caller reported details that could only have come from an eyewitness, and she identified herself[3] and reported them through an emergency dispatch line.  The call was therefore sufficiently reliable for the police to act upon.  In short, the Norwich police had "reasonable suspicion" to stop Mr. Young.

The "reasonable suspicion" behind the October 2018 Ledyard stop is less clear,[4] but Mr. Young's Fourth Amendment claims against Ledyard and its police chief nevertheless fail because he has not plausibly alleged that they were constitutionally responsible for that stop.   As noted

---

[3]    Her name is redacted from Exhibit 6, but her address is not.  Because she provided at least her address to the dispatcher, she provided enough information to "allow for identifying and tracing" her.  *See Navarette*, 572 U.S. at 400 (calls to emergency dispatchers sufficiently reliable for "reasonable suspicion" purposes when callers provide enough information to "identify[] and trac[e]" them).

[4]    In contrast to the Norwich caller, who reported seeing someone "going into vehicles," the Ledyard caller said only that he observed someone who "should not be in the area."  (Compl., ECF No. 1, Ex. 11.)

above, Exhibit 11 suggests that he was stopped by a Troop E trooper, not a Ledyard officer. (Compl., ECF No. 1, Ex. 11.)  But even if he had been wrongfully stopped by a Ledyard officer, Chief Rich could not be sued for money damages for that Fourth Amendment violation unless Mr. Young plausibly pled that the chief was "personal[ly] involve[d] . . . in [the] alleged constitutional deprivations."  *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (quoting *Wright v. Smith*, 21 F.3d 496 (2d Cir. 1994)) (quotation marks omitted); *see also Doe v. Cent. Conn. State Univ.*, No. 3:19-cv-00418 (MPS), 2020 WL 1169296, at *4 (D. Conn. Mar. 11, 2020).  And he could not sue the Town of Ledyard for that violation either, unless he could plausibly allege that the violation was caused by the "execution" of an official town "policy or custom."  *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978).  In this case, there are no plausible, non-conclusory allegations of personal involvement by Chief Rich, nor any allegation that the responding officer was "execut[ing]" any wrongful, official Ledyard "policy or custom."  I therefore recommend that Mr. Young's Fourth Amendment claims be dismissed without prejudice.

### 2. Fourteenth Amendment

The Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend XIV, § 1.  The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).  As with the Fourth Amendment, violations of the Fourteenth Amendment may be addressed through an action for damages under Section 1983, provided that the violator was acting "under color of" state law. 42 U.S.C. § 1983.

To state a claim for racial discrimination under the Fourteenth Amendment, Mr. Young must plausibly allege that the defendants intentionally discriminated against him because of his

race.  *Brown*, 221 F.3d at 337 ("To state a race-based claim under the Equal Protection Clause, a plaintiff must allege that a government actor intentionally discriminated against him on the basis of his race.")  He may meet this burden by "point[ing] to a law or policy that expressly classifies persons on the basis of race."  *Id.* (citing *Hayden v. Cty. of Nassau*, 180 F.3d 42 (2d Cir. 1999) and *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995)) (quotation marks omitted).  He may also "identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner."  *Id.* (citing *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)).  Or he may "allege that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus."  *Id.* (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977)).

A plaintiff may not, however, meet his pleading burden with conclusory allegations of intentional conduct.  "[C]laims of race-based discrimination under the Equal Protection Clause . . . require that intentional discrimination be alleged in a non-conclusory fashion."  *Clyburn v. Shields*, 33 F. App'x 552, 555 (2d Cir. 2002) (summary order); *Traylor v. Hammond*, 94 F. Supp. 3d 203, 215 (D. Conn. 2015).  "It is hornbook law that the mere fact that something bad happens to a member of a particular racial group does not, without more, establish that it happened *because* the person is a member of that racial group."  *Id.* (quoting *Williams v. Calderoni*, No. 11-Civ.-3020, 2012 WL 691832, at *7 (S.D.N.Y. Mar. 1, 2012)).  "The naked assertion by a plaintiff that 'race was a motivating factor' without a fact-specific allegation of a causal link between defendant's conduct and the plaintiff's race is too conclusory to survive a motion to dismiss."  *Id.* (quoting *Yusuf v. Vassar Coll.*, 827 F. Supp. 952 (S.D.N.Y. 1993)).  By extension, such assertions are too conclusory to survive review under 28 U.S.C. § 1915(e)(2)(B)(ii).

A plaintiff also does not meet his pleading burden by alleging that a facially neutral policy affects his racial group more than other groups. *Davis v. Malloy*, No. 3:17-cv-1740 (MPS), 2018 WL 5793786, at *5 (D. Conn. Nov. 5, 2018). As the Court of Appeals has explained, "equal protection claims under § 1983 cannot be based solely on the disparate impact of a facially neutral policy." *Reynolds v. Barrett*, 685 F.3d 193, 201 (2d Cir. 2012). This is because "proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Id.* (quoting *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188 (2003)). "Therefore, a plaintiff pursuing a claimed . . . denial of equal protection under § 1983 must show that the discrimination was intentional," and accordingly, "plaintiffs cannot proceed under a disparate impact theory of liability." *Id.* (quoting *Patterson v. Cty. of Oneida*, 375 F.3d 206 (2d Cir. 2004)).

In this case, Mr. Young's racial discrimination or equal protection allegations are either conclusory or based on an impermissible disparate-impact theory. He alleges that the defendants mistreated him "base[d] on [his] race and color" (Compl., ECF No. 1, Prelim. Stmt.), but this is the sort of "naked assertion" that is "too conclusory to survive." *Traylor*, 94 F. Supp. 3d at 215. He contends that the "City of Norwich is analyze [sic] by data agencies regarding ethnic and racial disparities towards his heritage" (Compl., ECF No. 1, ¶ 46), and he attached as Exhibit 17 a Norwich Bulletin article reporting that the city was "among six town police departments . . . that have such unusually high rates of stopping black and Hispanic drivers that their data will be studied further to try to determine why." (*Id.* Ex. 17.) But this is merely disparate impact evidence. And the Court of Appeals has held that such evidence, standing alone, is insufficient to state a claim for a racially discriminatory equal protection violation under the Fourteenth Amendment and

Section 1983.   I therefore recommend that Mr. Young's Fourteenth Amendment claims be dismissed.

###   3.   First Amendment

The First Amendment protects "the freedom of speech," U.S. Const. amend. I, and political canvassing is among the most highly protected forms of speech.   As one court put it, "[c]ourts have traditionally afforded the highest level of First Amendment protection to individuals or groups actively involved in handing out pamphlets or conducting canvassing." *N.J. Envtl. Fed'n v. Wayne Twp.*, 310 F. Supp. 2d 681, 690 (D. N.J. 2004) (citing *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150 (2002)).

To state a claim for a First Amendment violation, a plaintiff must plausibly allege three elements.   "A private individual who asserts a First Amendment violation must show: (1) he has a right protected by the First Amendment; (2) the defendants' actions were motivated or substantially caused by plaintiff's exercise of that right; and (3) the defendants' actions caused him some injury." *Dingwell v. Cossette*, 327 F. Supp. 3d 462, 469 (D. Conn. 2018) (quoting *Dorsett v. Cty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013)) (quotation marks and brackets omitted).   The third element of "injury" is met when the plaintiff alleges "either that his speech has been adversely affected . . . or that he has suffered some other concrete harm." *Id.* at 469-70 (internal quotation marks omitted).   By contrast, it is not satisfied by "[h]urt feelings or a bruised ego." *Id.* at 470 (quoting *Zherka v. Amicone*, 634 F.3d 642 (2d Cir. 2011)).

Mr. Young claims that the "defendants violated his First" Amendment rights (Compl., ECF No. 1, Prelim. Stmt.), but he does not plausibly allege that his political speech motivated or caused any defendant to inflict any injury upon him.   With respect to the municipal defendants, his factual allegations point to exactly the opposite conclusion – he says that they stopped him precisely

because they did *not* know that he was canvassing, and instead thought that he might be rifling through people's yards and cars.  (*See* Compl., ECF No. 1, ¶¶ 16-18, 20-22, Ex. 12.) So far as his complaint discloses, both the Norwich and Ledyard incidents ended almost immediately upon him identifying himself as an election canvasser.  (*See id.* ¶¶ 17-18, 21-22.)  Moreover, his principal complaint against Senator Osten is that she failed to notify either Norwich or Ledyard that her canvassers would be working in their towns, reinforcing that the officers did not know about his political activity at the time they stopped him.  (*Id.* ¶ 23.)  None of his factual allegations support any claim that the defendants inflicted an injury on him because he was exercising his free speech rights.  His claims under the First Amendment should be dismissed accordingly.

### 4.    Fifth Amendment

Mr. Young asserts that his Fifth Amendment rights were violated (Compl., ECF No. 1, Prelim. Stmt.), but this claim fails because the Fifth Amendment applies only to federal actors. "The Fifth Amendment's Due Process Clause protects citizens against only federal government actors, not State officials."  *Mitchell v. Home*, 377 F. Supp. 2d 361, 372 (S.D.N.Y. 2005) (citing *Dusenbery v. U.S.*, 534 U.S. 161 (2002)).  Due process and equal protection claims against state actors are enforceable, if at all, through the Fourteenth Amendment and Section 1983 – not through the Fifth Amendment.  *Id.* at 372-73.  In this case, Mr. Young does not allege that any of the defendants are federal actors.  His Fifth Amendment claims should be dismissed as a consequence.

### 5.    Conspiracy to interfere with civil rights, 42 U.S.C. § 1985

Conspiracies to deprive persons of the equal protection of the laws are illegal, and the victim may sue the conspirators for money damages.  Section 2 of the Civil Rights Act of 1871, now codified at 42 U.S.C. § 1985(3), prohibits conspiracies "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws."  The

victim of such a conspiracy "may have an action for the recovery of damages occasioned by such injury or deprivation." *Id.*

To state a claim for a Section 1985 conspiracy, a plaintiff must plausibly allege four elements. He must plead facts that, if proven, would show "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 791 (2d Cir. 2007). A Section 1985 complaint that does not plausibly allege all four elements is subject to dismissal. *Traylor*, 94 F. Supp. 3d. at 216.

The first element of conspiracy is not satisfied by unsupported, conclusory allegations of an agreement between the alleged conspirators. "[V]ague and conclusory allegations that defendants entered into an unlawful agreement . . . do not suffice." *Kiryas Joel Alliance v. Vill. of Kiryas Joel*, 495 F. App'x 183, 190 (2d Cir. 2012) (summary order). To plead the first element plausibly, "a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003) (internal quotation marks omitted).

Mr. Young alleges that Senator Osten, Chief Daley and Chief Rich "agree[d] to formulate and regulate laws of their own values" (Compl., ECF No. 1, Prelim. Stmt.), but he provides no non-conclusory "factual basis supporting a meeting of the minds." He says that Senator Osten and Chief Daley met *after* the August 2018 incident (*see id.* ¶ 27), and he disbelieves her claims about

who was present at the meeting.[5]  But these claims do not add up to a plausible allegation of a pre-incident agreement to violate his civil rights.  I therefore recommend that, to the extent that the complaint attempts a conspiracy claim under Section 1985, it be dismissed.

### 6.    Title VII employment discrimination

Title VII forbids race discrimination in employment.  "It shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to . . . compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. 2000e-2(a)(1).

Because Title VII is an employment discrimination statute, it follows that Title VII claims can only be asserted against the plaintiff's employer.  "Employers, not individuals, are liable under Title VII."  *Reynolds*, 685 F.3d at 202; *accord McBride v. Routh*, 51 F. Supp. 2d 153, 157 ("[T]he language of Title VII compel[s] a holding that only employer-entities have liability under Title VII.").  In this case, there are no allegations that the plaintiff was employed by any defendant other than Senator Osten.  Because the two police chiefs, the two municipalities and the State of Connecticut were not his employers, any Title VII claims against them should be dismissed.

To state a Title VII race discrimination claim against Senator Osten, Mr. Young must plausibly allege two elements.  First, he must allege that "the employer took adverse action against him."  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015).  Second, he must plead fact that, if proven, would show that "his race . . . was a motivating factor in the employment decision."  *Id.*  Put differently, "[a]t the pleadings stage . . . a plaintiff must allege that the employer

---

[5]    Senator Osten e-mailed Mr. Young about the August 2018 incident on February 6, 2019.  (Compl., ECF No. 1, Ex. 12.)  In her e-mail, she claimed to have "met with the Norwich Police Chief, accompanied by a representative of the NAACP."  (*Id.*)  Mr. Young disbelieves the senator's claim to have met with an NAACP representative.  (*See id.* ¶¶ 26-29.)

took adverse action against [him] at least in part for a discriminatory reason, and [he] may do so by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." *Id.* at 87 (citing *Littlejohn v. City of N.Y.*, 795 F.3d 297 (2d Cir. 2015)).

The first element of "adverse action" is satisfied when the employer materially changes the conditions of the plaintiff's employment for the worse. "A plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment." *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000). To qualify as "materially adverse," the employer's action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (quoting *Crady v. Liberty Nat'l Bank & Tr. Co. of Ind.*, 993 F.2d 132 (7th Cir. 1993)). Examples of qualifying employer actions include "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities." *Id.* (internal quotation marks omitted).

Here, Mr. Young does not allege that Senator Osten materially changed his conditions of employment. There is no allegation that she fired him; no claim that she demoted him; no claim that she took away his benefits; and no claim that she diminished his job responsibilities. He does claim that she refused to give him paid time off to recover from the emotional distress of the Norwich incident (Compl., ECF No. 1, ¶¶ 10, 12, 25 and Exs. 8-10, 12), but he does not allege that paid time off was a benefit to which he was entitled. (*See* discussion, Section IV.B.8 *infra.*) And even if he had done so, this claim would fail on the second element because he has not alleged that the denial occurred under circumstances "giving rise to a plausible inference of discrimination."

*Vega*, 801 F.3d at 87.  I therefore recommend that any Title VII claim against Senator Osten be dismissed.

### 7.    OSHA

Mr. Young alleges in substance that Senator Osten failed to provide him with a safe workplace.  He says that the senator put his "safety at risk" by failing to "advise [the] City of Norwich" that he was canvassing in the area.  (Compl., ECF No. 1, ¶ 19.)  He makes a similar claim about her failure to advise the Town of Ledyard, and she also alleges that the senator failed to protect him from dog attacks.  (*Id.* ¶¶ 23, 52.)  Although these allegations may implicate state statutory or common law causes of action, this Court would not have jurisdiction over those.  (*See* discussion, Section IV.A.4 *supra*.)  I therefore interpret the allegations as attempting to state a claim under the federal Occupational Safety and Health Act ("OSHA"), 29 U.S.C. §§ 651 *et seq.*

OSHA, however, does not provide a private cause of action.  *Donovan v. Occupational Safety & Health Review Comm'n*, 713 F.2d 918, 926 (2d Cir. 1983) ("Under OSHA, employees do not have a private right of action."); *Augustus v. AHRC Nassau*, 976 F. Supp. 2d 375, 400 n.42 (E.D.N.Y. 2013) ("OSHA provides no private right of action.").  Stated another way, OSHA authorizes the U.S. Secretary of Labor to file actions to remedy workplace safety violations, 29 U.S.C. § 659, but it does not authorize private lawsuits by persons in Mr. Young's position. *Donovan*, 713 F.2d at 926.

### 8.    FMLA

Mr. Young complains that Senator Osten did not provide him with paid time off to recover from the emotional trauma of the August 2018 traffic stop.  (Compl., ECF No. 1, ¶¶ 10, 12, 25 and Exs. 8-10, 12.)  Leaving aside whatever state law claims these allegations raise – because, as with the safe workplace claims, this court would not have jurisdiction over them – I interpret the

allegations as an effort to state a claim under the federal Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*

The FMLA requires employers to give employees time off for certain health conditions, but it does not require the employer to pay for that time off. FMLA-eligible employees are "entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D); *see also Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 174 (2d Cir. 2006). But the statute adds that "leave granted under [that provision] may consist of unpaid leave." 29 U.S.C. § 2612(c).

In this case, Mr. Young's exhibits affirmatively demonstrate that Senator Osten's staff offered him unpaid leave. In his own January 2, 2019 letter to the senator, he recounted that he asked the campaign manager for "some days off so I can recuperate, and she said "yes, but [he] could not get paid." (Compl., ECF No. 1, Ex. 10.) In any event, he has not pled a plausible claim against her for a violation of the FMLA.

### 9.    The Penn Act, Conn. Gen. Stat. § 54-1m

Mr. Young claims that the defendants violated the Penn Act (*id.* ¶¶ 53-56), but like OSHA, the Penn Act does not provide a private cause of action. "The Penn Act prohibits law enforcement officers from engaging in racial profiling, requires police departments to develop policies regarding racial profiling, and imposes reporting requirements on municipalities with regard to racial profiling complaints." *Traylor*, 94 F. Supp. 3d at 219. Yet "the plain language of the Penn Act does not provide a private right of action to enforce its requirements." *Id.*; *see also Marshall v. Town of Middlefield*, No. 3:10-cv-1009 (JCH), 2012 WL 601783, at *6 n.3 (D. Conn. Feb. 23,

2012) ("The court finds no authority to suggest that the [Penn Act] provides a private right of action to enforce its requirements."). His claims under the Penn Act should therefore be dismissed.

### 10.    Common law emotional distress

Mr. Young alleges that "[a]ll of the defendants caused [him] extreme emotional distress" (Compl., ECF No. 1, Prelim. Stmt.), but that claim does not invoke any of this Court's three bases for jurisdiction.   (*See* discussion, Section IV.A.4 *supra.*)   Common law, state law claims for emotional distress do not qualify for "federal question" jurisdiction under 28 U.S.C. § 1331.   *See*, *e.g.*, *Fisher v. White*, 715 F. Supp. 37, 39 (E.D.N.Y. 1989) (citing *Gully v. First Nat'l Bank*, 299 U.S. 109 (1936)).   The parties are not citizens of different states, and "diversity jurisdiction" therefore does not apply under 28 U.S.C. § 1332.   And since I have recommended dismissal of all of Mr. Young's federal constitutional and statutory claims, I further recommend that the Court decline to exercise supplemental jurisdiction over this state law claim under 28 U.S.C. § 1367. *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.") (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343 (1988)).

### 11.    Claims against the State of Connecticut

Finally, Mr. Young named the State of Connecticut as a defendant, but he does not allege any wrongdoing by the state.   For this reason – and also because the state is immune from money damage suits where, as here, it has not waived that immunity (*see* discussion, Section IV.A.3 *supra*) – I recommend that any claims against the state be dismissed.

## IV.  CONCLUSION

For the foregoing reasons, I recommend that Judge Shea deny Mr. Young's IFP motion and dismiss his complaint.  I further recommend that the denial and dismissal be without prejudice. If my recommendation is accepted, this would mean that Mr. Young could (a) file another motion for leave to proceed IFP, clearly explaining his financial picture and the discrepancy in his initial application; and (b) file an amended complaint curing the defects cited in this recommended ruling. There may be no cure for these defects, but *pro se* plaintiffs are usually permitted at least one try. *See*, *e.g.*, *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (*pro se* plaintiffs typically permitted "leave to amend at least once").

This is a recommended ruling by a magistrate judge.  Fed. R. Civ. P. 72(b)(1); D. Conn. L. Civ. R. 72.1(C).  **If Mr. Young wishes to object to my recommendation, he must file that objection with the Clerk of the Court within fourteen days.**  Fed. R. Civ. P. 72(b)(2); D. Conn. L. Civ. R. 72.2(a).  If he does not do so, he may not thereafter assign as error any claimed defect in this recommended ruling.  D. Conn. L. Civ. R. 72.2(a).  Failure to file a timely objection will also preclude appellate review.  *See* 28 U.S.C. § 636(b)(1); *Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir. 1989) ("[F]ailure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision."); *accord Impala v. U.S. Dept. of Justice,* 670 F. App'x 32 (2d Cir. 2016) (summary order).

*/s/ Thomas O. Farrish*
_____
Hon. Thomas O. Farrish
United States Magistrate Judge
